S95P1366. GREENE v. THE STATE.
(469 SE2d 129)

CARLEY, Justice.

Daniel Greene was convicted of the murder of a customer in a convenience store and he was also convicted of armed robbery and of committing an aggravated assault against the store clerk. As an aggravating circumstance, the jury found that the murder had been committed during the course of the armed robbery and Greene was sentenced to death. OCGA § 17-10-30 (b) (2). For the armed robbery, he received a life sentence and, for the aggravated assault, a 20-year sentence. Greene appeals from the judgments entered by the trial court.[1]

*Pre-Trial Rulings*

1. The trial court did not abuse its discretion in denying Greene's motion for funds for investigative assistance, since Greene failed to show that an investigator was necessary to his defense or that his trial was rendered unfair because he was denied funds for investigative assistance. See *Isaacs v. State,* 259 Ga. 717, 725 (13) (386 SE2d 316) (1989); *Rogers v. State,* 256 Ga. 139, 145 (8) (344 SE2d 644) (1986).

Likewise, Greene also failed to make a threshold showing that his

---

[37] See *Moore v. State,* 263 Ga. 11, 14 (427 SE2d 766) (1993).

[1] The crimes occurred on September 27, 1991. Greene was indicted on October 14, 1991. On June 15, 1992, the state filed its notice of intent to seek the death penalty. Voir dire commenced on November 30, 1992, and the trial of the case began on December 5, 1992. On December 7, 1992, the jury returned its verdict finding Greene guilty of the crimes charged. The jury returned its sentencing phase verdict on December 8, 1992, and the trial court sentenced Greene on December 9, 1992. Greene filed a motion for new trial on March 22, 1993. He amended the motion on May 4, 1994. The trial court denied the motion on March 24, 1995. Greene filed his notice of appeal on April 25, 1995. The case was docketed on May 22, 1995, and orally argued on September 18, 1995.

mental health would be an issue in either phase of trial. Compare *Bright v. State*, 265 Ga. 265 (2) (e), (f) (455 SE2d 37) (1995). Instead, his attorneys merely made conclusory statements that they needed assistance to determine whether Greene's mental health would be a significant issue, and they offered no evidence or testimony to support those conclusory statements. See *Todd v. State*, 261 Ga. 766, 772 (11) (410 SE2d 725) (1991); *Roseboro v. State*, 258 Ga. 39, 41 (3) (d) (365 SE2d 115) (1988). It follows that the trial court did not err in denying Greene's request for funds for a mental health evaluation.

## Jury Selection

2. Greene contends that the trial court erred in excusing five prospective jurors for cause based upon their opposition to the death penalty.

*Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985) is the controlling authority as to the death-penalty qualification of prospective jurors and its holding is unmistakably clear and unambiguous. The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment

> is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon*[ *v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968),] reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Wainwright v. Witt*, supra at 424-426 (II).

Contrary to Greene's contentions, the transcript of voir dire does

not show that any of the prospective jurors were disqualified merely for expressing "qualms" about the death penalty or for "leaning" toward a life sentence. Rather, the prospective jurors were disqualified only after the trial court undertook an exhaustive and conscientious effort to determine whether their views on the death penalty would prevent *or* substantially impair the performance of their duties in accordance with their instructions and oaths. It is not determinative that, at some point during voir dire, each of the prospective jurors may have given answers which, if considered in isolation, would indicate that his or her opposition to the death penalty was not "automatic." Likewise, it is not necessary that the disqualification of each of the prospective jurors may not appear with "unmistakable clarity." The relevant inquiry is whether the trial court's finding that the proper standard for death-penalty disqualification was met as to each of the prospective jurors is "fairly supported" by the record "considered as a whole." *Wainwright v. Witt*, supra at 433 (IV). On review, an appellate court should not substitute its findings for those of the trial court. *Wainwright v. Witt*, supra at 434 (IV). The conclusion that a prospective juror is disqualified for bias is one that is based upon findings of demeanor and credibility which are peculiarly within the trial court's province and such findings are to be given deference by appellate courts. *Wainwright v. Witt*, supra at 428 (III). Applying this controlling authority here, it is clear that, whatever ambiguity may exist in the record of the voir dire, "the trial court, aided as it undoubtedly was by its assessment of [the prospective jurors'] demeanor[s], was entitled to resolve it in favor of the State." *Wainwright v. Witt*, supra at 434 (IV).

Greene's contention that the trial court erred in excusing the prospective jurors is based upon a fundamental misconstruction of *Witherspoon v. Illinois*, supra. *Witherspoon* did not create any new ground for challenging a prospective juror in a death-penalty case, but merely addressed the long-recognized ground of disqualification for bias in the context of a death-penalty case. *Wainwright v. Witt*, supra at 423 (II).

> [T]here is nothing talismatic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Witherspoon* is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will

be biased in his favor.

*Wainwright v. Witt,* supra at 423 (II). Because a contrary holding would be based upon an unauthorized "talismatic" interpretation of *Witherspoon* and a misapplication of the controlling authority of *Wainwright,* the trial court's finding that the prospective jurors were disqualified must be affirmed.

3. Greene urges that it was error to fail to disqualify a prospective juror based upon her purported bias in favor of the death penalty. However, this enumeration likewise is controlled by *Wainwright* and the trial court was authorized to find that the "final distillation" of the prospective juror's thoughts demonstrated her qualification. *Taylor v. State,* 261 Ga. 287, 292 (5) (404 SE2d 255) (1991).

4. Contrary to Greene's contentions, the record reflects that the trial court was even-handed in its efforts to obtain a jury whose members would not be biased either for or against the imposition of the death penalty.

5. In the State's exercise of its peremptory strikes, Greene established a prima facie case of discrimination against six African-American prospective jurors. See *Batson v. Kentucky,* 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986); *Osborne v. State,* 263 Ga. 214, 215 (3) (430 SE2d 576) (1993); *Davis v. State,* 263 Ga. 5, 7 (10) (426 SE2d 844) (1993). Therefore, the trial court properly required the prosecutor to articulate the reasons for each of these peremptory strikes. Greene contends that the trial court erred in accepting the prosecutor's articulated reasons, urging that those reasons were neither supported by the record nor applied to white prospective jurors.

Contrary to Greene's contention, a thorough review of the voir dire of each of the six prospective jurors reveals a valid racially-neutral basis for the employment of a peremptory strike. *Batson* does not demand that the explanation proffered by a prosecutor be "persuasive, or even plausible." *Purkett v. Elem,* ____ U. S. ____ (115 SC 1769, 131 LE2d 834) (1995). "[A] 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem,* supra at 1771. The prosecutor correctly noted that the first prospective juror expressed sympathy for cocaine users who engage in uncharacteristic criminal activity, the second failed to disclose a criminal conviction, the third failed to report for jury duty the first day and reported a kidney problem which would interfere with her service, the fourth was a single mother with no family in town to assist with child care, the fifth expressed reservations about the death penalty, and the sixth was a single mother with doubtful child care arrangements who expressed hesitation about the death penalty. The white prospective jurors to whom Greene points for comparison did not in fact give comparable answers on voir dire. For example, those

with small children were able to make arrangements for child care, none had health problems which would interfere with service, and those with some hesitation regarding the death penalty were favorable to the State in other ways. The State's proffered reason for striking a potential juror is sufficient to rebut a prima facie showing of racial discrimination so long as it is racially neutral, related to the case, clear and reasonably specific. *Gamble v. State*, 257 Ga. 325, 327 (5) (357 SE2d 792) (1987). The State's explanations met this test and the fact that the State accepted no similarly situated white prospective juror undercuts any motive to exclude African Americans. See *Osborne v. State*, supra at 216-217 (3).

Although Greene did respond to the reasons articulated by the prosecutor, he urges that the trial court erred in failing to afford him a more extensive opportunity to rebut those proffered reasons. However, once a race-neutral explanation has been tendered, the trial court must then decide whether purposeful racial discrimination has been proven. *Purkett v. Elem*, supra at 1770-1771. The prosecutor's proffered explanations in this case satisfied the State's burden of articulating a nondiscriminatory reason for the strikes and the inquiry thus was properly framed for the trial court's determination. *Purkett v. Elem*, supra at 1771.

Greene further contends that the trial court erred in ruling that the State need not articulate its reasons for exercising a peremptory strike against the only prospective juror who was of Asian Indian descent. However, the first step in establishing a prima facie case of purposeful discrimination is to establish that the prospective juror belongs to a cognizable racial or ethnic group. See *Batson*, 476 U. S. at 94; *Powers v. Ohio*, 499 U. S. 400, 402 (111 SC 1364, 113 LE2d 411) (1991). Greene did not even attempt to show that Asian Indians are a cognizable group and he cites no authority for aggregating racial or ethnic groups. It follows that Greene failed to establish a prima facie case of racial discrimination against Asian Indians under *Batson*. See *United States v. Bucci*, 839 F2d 825, 833 (1st Cir. 1988), cert. denied, 488 U. S. 844 (109 SC 117, 102 LE2d 91) (1988).

6. Although a prospective juror initially indicated that he would tend to believe a police officer over a defendant, he later stated that he would judge a police officer's credibility by the same criteria as any witness. It follows that the trial court did not err in denying Greene's challenge to this prospective juror for alleged bias in favor of the police. See *Foster v. State*, 248 Ga. 409, 410 (3) (283 SE2d 873) (1981). See also *Johnson v. State*, 262 Ga. 652 (2) (424 SE2d 271) (1993).

7. The trial court did not improperly restrict Greene's voir dire either by limiting his efforts to rehabilitate two prospective jurors who repeatedly expressed unwavering opposition to the death penalty or by disallowing questions of a technical legal nature. See *Spencer v.*

*State*, 260 Ga. 640, 641 (1) (d) (398 SE2d 179) (1990); *Baxter v. State*, 254 Ga. 538, 543 (7) (331 SE2d 561) (1985).

## The Guilt-Innocence Phase of Trial

8. The evidence presented at trial authorized the jury to find the following facts:

On the evening of September 27, 1991, Greene made a series of trips to the Suwanee Swifty, a convenience store and gasoline station in Reynolds, Taylor County, Georgia. During his final visit, Greene grabbed the store clerk, Virginia Wise, held a knife to her throat, and told her to give him the money from the cash register. After obtaining the money, $142.55, Greene continued to hold the knife to Wise's throat. He pulled her to the back room, then cut her across three fingers and stabbed her through the lung and liver. Upon hearing the automatic doorbell ring as Bernard Walker entered the store, Greene placed Wise against the bathroom wall, telling her that if she left the room he would have to kill her. Greene reentered the public area of the store and encountered Walker waiting at the counter to make a purchase. He stabbed Walker in the heart, threw down the knife, left the store and drove away. After attempting to get help, Walker fell dead in the parking lot.

Later that evening, Greene went to the home of Willie and Donice Montgomery, an elderly couple in rural Macon County for whom Greene had worked as a farm laborer for about two months. Greene burst through the Montgomerys' kitchen door wielding a knife and asked for their car keys. Mr. Montgomery gave Greene the keys, and Greene proceeded to stab each victim multiple times in the head.

After leaving the Montgomerys' home, Greene drove their car to a convenience store in Warner Robins, Houston County, Georgia. Once there, he held a butcher knife to the cashier, Bonnie Roberts, and forced her to give him the money from the cash register. He then walked toward her and attempted to stab her in the chest. She bent down, and Greene drove the knife into the back of her shoulder. Greene then drove the Montgomerys' car to the home of an acquaintance in Warner Robins, where he was apprehended.

Greene was tried separately and convicted of the Macon and Houston County crimes. The trial from which this appeal is taken concerned only Greene's indictment for the crimes committed in Taylor County.

Before trial, Greene confessed to the crimes, explaining in a videotaped interview that he had committed them to obtain money for crack cocaine. At trial, Greene testified that he could not remember committing the crimes or confessing, and that he could only recall experiencing a severe headache inside the Suwanee Swifty after hav-

ing smoked a cigarette given to him earlier by an acquaintance. He theorized that his criminal behavior might have been induced by the cigarette, which must have been laced with a powerful, mind-altering drug.

The evidence is sufficient to enable any rational trier of fact to find Greene guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

9. Assuming, without deciding, that the prosecutor's reference in his opening statement to the murder victim's popularity in the community, and his comment to the jurors in closing argument that they could not help but have sympathy for the victim's family were improper, Greene failed to object and those comments did not, in all reasonable probability, change the result of trial. See *Todd v. State*, supra at 767 (2) (a).

10. When the murder victim's mother began crying and was escorted from the courtroom, Greene moved for a mistrial. The trial court denied the motion, but did give curative instructions. When, in his closing argument, the prosecutor made reference to this incident, Greene immediately objected and the trial court again instructed the jurors to put the incident out of their minds. Thereafter, Greene failed to move for a mistrial or any additional instructions and we find no reasonable probability that the prosecutor's comments changed the result of the trial. *Todd v. State*, supra at 767 (2) (a).

11. The record does not support Greene's contention that his right against self-incrimination was violated by references to his decision not to testify.

12. Likewise, the record does not support Greene's contention that there were improper references made to his failure to testify at his earlier trial in another county.

13. Greene urges that the trial court erred in admitting evidence of the crimes that he committed in Macon and Houston counties on the evening of September 27, 1991, and early morning of September 28, 1991, immediately following his commission of the crimes for which he was on trial in the present case. However, those crimes were admissible as elements of one crime spree and as evidence of Greene's bent of mind and of the circumstances of his arrest. See *Todd v. State*, supra at 771 (7); *Davis v. State*, 255 Ga. 598, 605 (9) (340 SE2d 869) (1986); *Ingram v. State*, 253 Ga. 622, 632 (6) (323 SE2d 801) (1984).

Greene further contends that the jury was exhorted to convict him as punishment for the crimes he committed in Macon and Houston counties. In context, however, the prosecutor's remarks conveyed to the jurors that they should only consider evidence of those crimes for proper purposes, such as its tendency to rebut the defense theory that Greene merely ran into Walker accidentally as Greene was run-

ning out of the Suwanee Swifty with a knife in his hand.

14. The State indicated that various of its witnesses had testified in the Macon or Houston County trials regarding Greene's alleged crime spree. By doing so, the State did not engage in improper bolstering of those witnesses. Furthermore, Greene failed to object, and there is no reasonable probability that the outcome of the trial was changed. See *Todd v. State*, supra at 767 (2) (a).

15. When Greene attempted to question the deputy sheriff as to whether the victim's cousin had ever been investigated for any crime, the trial court sustained the State's relevance objection. There was no error in this evidentiary ruling, since Greene's identity as the perpetrator was not contested.

16. On direct examination, Ms. Montgomery, one of the Macon County victims, testified that when Greene was coming in the door of her home, she heard her husband say, "Don't come in here; don't come in here." The statement was admissible as part of the res gestae. See *Jarrett v. State*, 265 Ga. 28, 29 (2) (453 SE2d 461) (1995).

17. During direct examination of the Montgomerys' son, the prosecutor asked, "Mr. Montgomery, is there anything you know, any reason you know why Daniel Greene would want to go in there and do that to your mom and dad?" The witness answered in the negative. Assuming, without deciding, that the question was improper, Greene has failed to show harm.

18. The trial court did not err in allowing the State to question two witnesses about their prior inconsistent statements, since the requirements of OCGA § 24-9-83 were met. See *Meschino v. State*, 259 Ga. 611, 613 (2) (385 SE2d 281) (1989). It follows, therefore, that the prosecutor's references to the inconsistent statements in closing argument were not improper. The trial court did not err in failing to instruct on impeachment, since Greene admitted that such an instruction was unnecessary. See *Jones v. State*, 242 Ga. 893, 895 (5) (252 SE2d 394) (1979).

19. Greene contends that the prosecutor's closing argument was improper in several respects.

(a) Contrary to Greene's contention, the prosecutor did not improperly vouch for the credibility of an eyewitness, but merely defended the witness' credibility against impeachment.

(b) The prosecutor's characterization of Greene as "mean" was not improper, but was a legitimate inference to be drawn from the evidence.

(c) It was improper for the prosecutor to ask the jurors rhetorically what they would have done in Wise's situation, "as the jurors were thereby 'invited to place themselves in the victim's place in regard to the crime itself. (Cit.)' [Cit.]" *Burgess v. State*, 264 Ga. 777, 785 (20) (450 SE2d 680) (1994). However, as was the case in *Burgess*,

the error was harmless given the overwhelming evidence of Greene's guilt.

(d) The prosecutor did not improperly shift the burden of proof to Greene or comment on Greene's failure to testify by remarking to the jurors that they had heard nothing that showed the victim deserved to die nor any evidence of self-defense. It is not improper to comment on the failure of the defense to present evidence to rebut the State's evidence of guilt. See *Thornton v. State*, 264 Ga. 563, 567 (4) (a) (449 SE2d 98) (1994). Likewise, the prosecutor's comment on Greene's demeanor in the courtroom was not improper. See *Christenson v. State*, 261 Ga. 80, 88 (7) (b) (402 SE2d 41) (1991).

(e) Greene's contention that the prosecutor improperly alluded to extrajudicial knowledge of a witness lacks merit. Read in context, the comment was merely a logical deduction from evidence presented at trial.

(f) The prosecutor did not invoke his expertise as a basis for returning a verdict as to Greene's guilt or the imposition of the death penalty. See *Conklin v. State*, 254 Ga. 558, 573 (11) (b) (331 SE2d 532) (1985). Moreover, as was the case in *Conklin*, supra at 573 (11) (b), considering the evidence that was presented, "it is unlikely that prosecutorial experience or expertise played a discernible role in the jury's evaluation of the vileness and brutality of [Greene's] crime[s]."

(g) Contrary to Greene's contention, the prosecutor neither misstated the burden of proof nor misled the jury on the definition of "malice aforethought."

(h) The prosecutor made two references to the sentencing phase of the trial and, after each reference, the trial court admonished the prosecutor that punishment was not an appropriate topic for the guilt-innocence phase. We conclude that the court's admonitions were sufficient to address any confusion in the minds of the jurors.

### The Sentencing Phase of Trial

20. There was no issue as to Greene's mental illness or retardation and, when Greene testified in his own behalf, he conceded his sanity and lack of retardation. Accordingly, it was not error for the prosecutor to pursue that topic and to argue to the jury that mental illness or retardation was not an impediment to imposition of the death penalty.

21. Greene urges that a witness was erroneously allowed to give an opinion as to sentencing. *Childs v. State*, 257 Ga. 243, 256 (19) (b) (357 SE2d 48) (1987). However, there was no objection at trial. Moreover, the jury's finding of a statutory aggravating circumstance was clearly supported by the record, Greene's crimes were gruesome and unprovoked, and his evidence in mitigation was weak. Under these

circumstances, we do not find a reasonable probability that, but for the witness' expression of his opinion, the jury would have returned a life sentence. See *Ford v. State*, 255 Ga. 81, 94 (8) (i) (335 SE2d 567) (1985).

22. Greene urges that the direct examination of his witnesses in mitigation was erroneously curtailed. However, the trial court was authorized to disallow questions which called for speculation or a witness' religious or philosophical attitudes about the death penalty. *Childs v. State*, supra at 256 (19) (b).

23. Relying upon OCGA § 17-8-76 (a), Greene urges that, on numerous occasions, the prosecutor made a reference to the possibility of parole and that the trial court failed to declare a mistrial.

On one occasion, the prosecutor made a comment which could reasonably be construed as referring to the possibility of Greene's escape rather than to his parole. In response to Greene's motion for a mistrial, the trial court nevertheless gave curative instructions and we find no error. See *Finney v. State*, 253 Ga. 346, 348 (5) (320 SE2d 147) (1984). This was Greene's only motion for mistrial based upon OCGA § 17-8-76 and on no other occasion did the prosecutor mention the word "parole." Even assuming that the prosecutor's other references violated the tenor of OCGA § 17-8-76 (a), Greene's failure to make a motion for a mistrial under OCGA § 17-8-76 (b) resulted in a waiver of his statutory right thereunder. *Finney v. State*, supra at 348 (5).

24. Greene contends that, in the cross-examination of his witnesses in mitigation, the State was erroneously allowed to use evidence of his other criminal activities in violation of OCGA § 17-10-2. However, not only was there a failure to object, OCGA § 17-10-2 was not applicable and there was no error. *Christenson v. State*, supra at 90 (8) (a).

25. Greene contends that an out-of-court statement attributed to him was inadmissible hearsay and that the Sheriff of Taylor County was erroneously allowed to testify to that statement. However, an out-of-court statement is considered hearsay only if it is offered to prove the truth of what is contained therein. *Bundrage v. State*, 265 Ga. 813, 814 (2) (462 SE2d 719) (1995). Here, the out-of-court statement was not offered to prove that Greene spoke the truth when he said that he was prepared to behave unless and until he received the death penalty. To the contrary, the out-of-court statement was offered to explain the pre-sentencing conduct of Greene and the Sheriff and, if their pre-sentencing conduct was a relevant inquiry, the statement would be admissible as original evidence and not as an exception to the hearsay rule. *Bundrage v. State*, supra at 814 (2); *Teague v. State*, 252 Ga. 534 (1) (314 SE2d 910) (1984).

Greene called the Sheriff as his own witness during the sentenc-

ing phase and, on direct examination, Greene undertook to show that he had been a model prisoner who was amenable to incarceration. This direct examination rendered the conduct of Greene and the Sheriff a relevant topic of inquiry by the State on cross-examination. If it could, the State should be allowed to show that Greene's previous "model prisoner" conduct was merely a ploy to evade the death penalty and to show that the Sheriff's previous conduct in securing Greene's person was not consistent with that afforded a "model prisoner." See *Blake v. State*, 239 Ga. 292, 295 (1) (236 SE2d 637) (1977). The out-of-court statement attributed to Greene accomplished both purposes. It explained Greene's pre-sentencing conduct toward the Sheriff and it explained the Sheriff's pre-sentencing conduct toward Greene, showing that the conduct of neither was consistent with the "model prisoner" status which Greene's direct examination of the Sheriff had intimated. Since it was Greene himself who rendered the inquiry into the pre-sentencing conduct of himself and the Sheriff a relevant topic, he cannot object that the State thereafter sought to explain that conduct with admissible original evidence. Under OCGA § 24-9-64, the State, as the opposite party, had the right to a thorough and sifting cross-examination of the witnesses whom Greene had called in an effort to avoid the death penalty.

At some point after Greene's out-of-court statement had been introduced over Greene's hearsay objection, the prosecutor questioned the Sheriff with general regard to the security measures that had been taken in the courtroom. Greene did not object to the question that the prosecutor posed to the Sheriff or to the Sheriff's answer thereto. The only objection that was ever raised by Greene was a hearsay objection to the Sheriff's testimony regarding the out-of-court statement attributed to Greene. That hearsay objection would not be broad enough to extend to a question and answer which were related, not to any out-of-court statement, but to the Sheriff's in-court actions. In any event, the mere passing reference to extraordinary-but-unspecified security measures was not inadmissible. Since the topic of Greene's status as "model prisoner" had been introduced by Greene himself, he cannot object that the State made a general showing that security measures utilized during his trial were not those which would be employed during the trial of a "model prisoner."

26. During closing argument in the sentencing phase, the prosecutor made references to certain Biblical teachings. Although Greene made no objection to these references in the trial court, he urges on appeal that those references mandate a reversal of his death sentence.

It is not and has never been the law of this state that religion may play no part in the sentencing phase of a death-penalty trial. As *Hill v. State*, 263 Ga. 37, 46 (19) (427 SE2d 770) (1993) clearly holds in Georgia, it is improper for the prosecutor to urge imposition of the

death penalty based upon the defendant's beliefs or to urge that the teachings of a particular religion mandate the imposition of that sentence, but the prosecutor nevertheless " 'may allude to such principles of divine law relating to transactions of men as may be appropriate to the case.' (Cit.) *Conner v. State*, 251 Ga. 113, 122-123 (303 SE2d 266) (1983)." *Hill v. State*, supra at 46 (19). See also *Crowe v. State*, 265 Ga. 582, 593 (18) (d) (458 SE2d 799) (1995).

> [I]t is clear that neither the Eighth Amendment nor OCGA § 17-10-35 (c) (1) ([cit.]) forbids a death penalty based in part on an emotional response to factors in evidence which implicate valid penological justifications for the imposition of the death penalty. Perforce, argument by the prosecutor which "dramatically appeals" to such legitimate emotional response is not "constitutionally intolerable."

*Conner v. State*, supra at 122 (5).

Greene points to nothing in the prosecutor's argument which urged the imposition of the death sentence based upon his religious belief or urged that the teachings of a particular religion mandated the imposition of that sentence against him. Rather, the argument challenged by Greene consists entirely of references to principles of divine law related to the penological justifications for the death penalty, including the concept of retribution and whether, considering the enormity of his crime, Greene should be extended mercy. It is just this type of argument that was found to be authorized in *Hill* and *Crowe*.

Moreover, even assuming that the prosecutor's argument was impermissible, it does not follow that Greene's death sentence must be reversed. On the issue of whether the prosecutor's argument in this case, to which there was no objection, warrants a reversal of the death sentence, *Crowe* and *Hill* cannot be distinguished and, as controlling authority, those cases mandate a finding that "there is no reasonable probability that this argument, even if improper, changed the result of the trial. [Cit.]" *Crowe v. State*, supra at 593 (18) (d).

27. Greene enumerates as error various other instances of alleged improper argument by the prosecutor in the sentencing phase.

(a) Contrary to Greene's contention, the prosecutor limited his argument to reasonable inferences from the evidence and to matters within common knowledge. See *Hall v. State*, 259 Ga. 412, 414 (2) (383 SE2d 128) (1989).

(b) When the prosecutor mentioned the victim's weeping mother who had been escorted from the courtroom during the guilt-innocence phase, Greene made no objection and we find no reasonable probability that this reference resulted in the imposition of the death

sentence. *Ford v. State*, supra at 94 (8) (i).

(c) Argument regarding general deterrence was not improper. *Fleming v. State*, 265 Ga. 541, 542 (458 SE2d 638) (1995).

(d) Argument regarding the bias and impeachment of Greene's mother as a character witness was not improper.

(e) It was not improper for the prosecutor to comment on the failure to produce witnesses as to certain of Greene's contentions. See *Isaac v. State*, 263 Ga. 872, 874 (4) (b) (440 SE2d 175) (1994).

(f) The prosecutor's statement that the videotape of Greene's confession had been in evidence for some time may not have been accurate, but the confession had been admitted and the reference to the length of time it had been in evidence could not have misled the jury into returning a death sentence.

28. Greene enumerates as error the trial court's refusal to give several of his requested charges. However, our review of the record shows that Greene's requests were either improper or were covered by the full and fair charge that was given by the trial court.

29. The trial court's failure to give certain charges which were never requested was not error.

30. We do not find that Greene's death sentence was imposed under the influence of passion, prejudice, or other arbitrary factor. See OCGA § 17-10-35 (c) (1). The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of the death sentence in this case.

*Judgments affirmed. All the Justices concur, except Hunstein, J., who concurs in the judgment and in all divisions except Division 26; Fletcher, P. J., who concurs specially; Benham, C. J., and Sears, J., who concur in part and dissent in part.*

### APPENDIX.

*Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Gibson v. State*, 261 Ga. 313 (404 SE2d 781) (1991); *Lee v. State*, 258 Ga. 762 (374 SE2d 199) (1988); *Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *Frazier v. State*, 257 Ga. 690 (362 SE2d 351) (1987); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980).

FLETCHER, Presiding Justice, concurring specially in part.

I concur in the majority opinion except for the rationale of Divi-

sion 25.

Greene's evidence during the sentencing phase that he was a model prisoner made relevant his conduct during his incarceration prior to trial. Therefore, the state's evidence that Greene made violent threats while purporting to be a model prisoner was admissible.

Greene's attempt to show that he had been a model prisoner while in the custody of the Sheriff of Taylor County did not, however, make relevant the fact that the Sheriff of Clayton County undertook extraordinary security measures during trial. Had an objection been raised, the trial court should have sustained it because that evidence was not relevant.

The admission of this evidence, even if over objection, was not so highly prejudicial as to require reversal. Visible signs of extraordinary security and conditions such as shackles and prison clothing are considered highly prejudicial because they are "constant reminder[s] of the accused's condition."[2] The challenged evidence here was a passing reference to unspecified security measures. In the absence of any details or embellishment, this brief statement was unlikely to influence the jury as would the constant sight of shackles.

BENHAM, Chief Justice, concurring in part and dissenting in part.

I concur in the affirmance of Greene's convictions, but I must respectfully dissent to the affirmance of the death sentence on several grounds. First, the trial court erred in excusing for cause several prospective jurors who said that they could vote for the death penalty but would have qualms about it. Second, the prosecutor improperly elicited testimony in the sentencing phase that, based on hearsay suggesting Greene might become violent at sentencing, extreme and unprecedented measures were taken to secure the courtroom. Finally, the prosecutor improperly urged execution on religious grounds. Each of these errors requires reversal of the sentence under settled principles of law.

1. Greene contends that the trial court committed reversible error in excusing five prospective jurors for cause on the ground that they opposed the death penalty. In Division 2 of its opinion, the majority dismisses this contention as unsupported both factually and legally. Yet the majority opinion fails to provide any summary of the voir dire and fails to cite any of our cases interpreting the standard articulated in *Wainwright v. Witt,* 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985). In fact, the record shows that although the prospective jurors expressed qualms about the death penalty, four of them unambiguously indicated on voir dire that they could vote to impose a death

---

[2] *Estelle v. Williams*, 425 U. S. 501, 504 (96 SC 1691, 48 LE2d 126) (1976).

sentence in an appropriate case. Therefore, this case is indistinguishable from *Jarrell v. State*, 261 Ga. 880 (1) (413 SE2d 710) (1992), and reversal is required.

The standard for death-qualification is whether the prospective juror's views on capital punishment would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.' " *Wainwright v. Witt*, 469 U. S. at 424, quoting *Adams v. Texas*, 448 U. S. 38, 45 (100 SC 2521, 65 LE2d 581) (1980). If a venire member merely indicates on voir dire that she would have difficulty imposing a death sentence, has qualms about the death penalty or is leaning toward a life sentence, she may not be disqualified on that basis. See *Jarrell v. State*, 261 Ga. at 880 (1) (reversing death sentence where juror who was excused for cause said capital punishment is justifiable for bad crimes but that she had qualms, was not sure she could vote for it, and would probably lean toward a life sentence); *Isaacs v. State*, 259 Ga. 717 (24) (386 SE2d 316) (1989); *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985). *Wainwright v. Witt* does not alter the holding of *Witherspoon* that

> a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

*Witherspoon v. Illinois*, 391 U. S. 510, 522 (88 SC 1770, 20 LE2d 776) (1968). See *Alderman*, 254 Ga. at 207 (4). To eliminate from the venire all persons voicing such scruples is to distort the "conscience of the community" which the jury is assembled to express. See *Witherspoon*, 391 U. S. at 519-520. That distortion in turn undermines the legitimacy of the judicial process in the exercise of its unparalleled power to determine whether an individual citizen will live or die. Execution of a death sentence imposed by a jury of such skewed composition would unconstitutionally deprive the defendant of life without due process of law. See id. at 523.

Examining in detail the voir dire of each of the prospective jurors in turn, it is plainly apparent that exclusion of at least four of them was clear error under the standard articulated in *Wainwright v. Witt* and applied in *Jarrell v. State*:

The first of the four prospective jurors indicated that it would be harder for her to impose the death penalty than a life sentence, that she would hate to know that she helped to put someone to death, and that she leaned toward a life sentence. However, she said unequivocally and repeatedly that she could vote for the death penalty under

appropriate circumstances. She stated that her hesitation about the death penalty would not affect her decision on conviction. Asked if she would want jurors like herself to serve if the victim were her son, she said that she would not, but she explained that as the victim's mother, she would want revenge.

Although the second of the prospective jurors initially stated that she was conscientiously opposed to the death penalty, she then clearly stated that under some circumstances she would vote for it. She expressed "some serious concerns about the death penalty," primarily of a religious nature, commenting on the price she would have to pay for partaking in something that resulted in the taking of another's life. When then asked by the prosecutor if it would be fair to say that, for religious or other reasons, she just had a feeling against the death penalty, she said, "Okay, I have a feeling against the death penalty." She also agreed that her predisposition was long-held. She reiterated on continued questioning by the prosecutor that although she had problems with the death penalty, she would be open-minded enough to consider all the evidence and that she was not leaning toward either sentence in advance in this case, although in general she leans toward life. When the court asked her if she could "just lay aside [her] religious beliefs," she said that she could not say definitely that she would be able to do so. Thereafter, the prosecutor asked her if she could "just casually cast aside" her views, and the juror answered, "I don't think you can just casually cast aside what's going to happen to someone's life." On repeated questioning, she said that she would bring her views to the jury room. However, she stated that her reservations would not keep her from considering the evidence and the instructions of the court, that she would listen to both sides, and that she would vote to impose the death penalty if the evidence warranted it. These responses clearly do not disqualify the juror from service. *Wainwright v. Witt* does not require that a prospective juror casually cast off her religious views at the jury room door, nor that she lack serious concern about imposing the death penalty.

The third of the prospective jurors, when asked whether she was conscientiously opposed to the death penalty, said, "Well, I've never . . . in my heart felt like that you should take one life for another. So, you know, it's kind of hard for me to answer." When the court asked her if she was so conscientiously opposed to capital punishment that she would not vote for the death penalty under any circumstances, she said that if upon hearing all of the evidence she was totally convinced that the death penalty was appropriate, she would vote for it. Later, when asked whether she could ever impose the death penalty, she contradicted her earlier answer, saying, "I don't know. It'd just be hard for me to do it. I guess my answer would have to be no." However, she explained that she was having a hard time answering with-

out having the benefit of any evidence about the case. She said that, because of her lack of information, she did not have a leaning toward either sentence at that time. She then clearly responded to a series of the court's questions by indicating that she *could* vote to impose the death penalty. She did express misgivings about having to send someone to the electric chair. Also, when the prosecutor asked her if it bothered her that the case was a death penalty case, she said that, having never been involved in one, she did have some reservations. The prosecutor then asked her,

> So, really and truly, insofar as the death penalty is concerned, your mind is not impartial between the two penalties, you would favor a life sentence just automatically because of the way you feel?

She answered, "Well, I wouldn't say that automatically, I mean, I would rather go for a life sentence than the death penalty." The prosecutor then asked the juror whether he would be able to talk her out of her personal views on the death penalty, and she responded that it would take more than just him. The state notes that the juror seemed to take offense at questions about the death penalty, but she explained that the questioning made her feel as if she were on trial. Again, the juror's answers, taken as a whole, clearly do not disqualify her from service. The law does not require complete impartiality between sentencing options in the abstract, nor does it disqualify from jury service all citizens with any misgivings about electrocution. Furthermore, the law requires jurors to impose the death penalty only when they have been convinced to do so by the facts in evidence, never by the arguments of counsel.

The fourth of the prospective jurors said she was not conscientiously opposed to the death penalty. Then, on first being asked whether she could vote for death in the electric chair, she said, "I don't think so." After reiterating that view several times, she said that under some circumstances, she probably could vote for the death penalty. Ultimately, in response to the court's questions, she said that she was not leaning toward either sentence. When the prosecutor began his questioning, she explained the apparent conflict in her answers, saying that she had not understood the questions at first, but that her decision about the penalty would depend entirely on the evidence and circumstances. She said she would probably vote for life imprisonment and that her belief that she would probably do so is one from which the prosecutor could not dissuade her. Finally, after the prosecutor asked her to concede that she is opposed to the death penalty, that she could never vote for it, and that she could not cast her beliefs aside, the juror said,

> I still say it all depends on what the circumstances are. I would have to first weigh it in my mind and think about it. But I just couldn't right off say, yes or no.

After more prodding, she said,

> Well, you know, I've told you I would have to hear what the evidence is and everything, and the surrounding things that led up to it or what's what. I couldn't just right off say yes or no.

In questioning by the defense, she clearly stated that she could vote for the death penalty. Despite strong and repeated coaxing down the path of disqualification, the prospective juror clearly demonstrated that she was qualified to serve.

Clearly these prospective jurors did not, as the majority indicates, merely at some point in voir dire give answers which, if considered in isolation, would indicate that their opposition to the death penalty was not "automatic." Nor is the record of voir dire ambiguous. On the contrary, each of the prospective jurors stated unambiguously that she could vote to impose the death penalty after considering all of the evidence and instructions. The majority's deference to the trial court's imagined findings regarding demeanor and credibility, under these facts, seriously undermines this Court's ability ever to review any excusal for cause under *Wainwright v. Witt*. As such, it is a dramatic departure from precedent. See, e.g., *Jarrell*, 261 Ga. at 880 (1).

Prosecutors, like defense attorneys, have available to them peremptory strikes. The prosecutor in this case could and did use a number of peremptory strikes to remove jurors perceived to lean toward a life sentence. However, the trial court's practice of removing for cause any prospective juror with serious concerns about imposing the death penalty was plainly unconstitutional. See *Witherspoon*, 391 U. S. at 523. "In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die." Id. at 520-521.

Because the voir dire of four jurors who were excused for cause, viewed as a whole, fails to fairly support the trial court's finding that any was disqualified, the death penalty cannot stand. See *Davis v. Georgia*, 429 U. S. 122, 123 (97 SC 399, 50 LE2d 339) (1976); *Pope v. State*, 256 Ga. 195 (7) (d), (e) (345 SE2d 831) (1986). Therefore, I must respectfully dissent.

2. In Division 25, the majority holds that the trial court properly admitted testimony regarding an out-of-court statement allegedly made by Greene to another inmate, because it was not hearsay and

was admissible to explain the conduct of Greene, as well as the conduct of the sheriff in employing certain security measures at trial. The majority further holds that testimony regarding the security measures themselves was admissible to rebut the witness' testimony that Greene had behaved in prison. On the contrary, admission of testimony as to both Greene's alleged statements and the security measures was highly improper and so prejudicial that it may well have determined the outcome of the sentencing phase of trial.

This case was tried in Clayton County. Over objection, the court permitted Sheriff Giles of Taylor County to testify on cross-examination that he had told the sheriff of Clayton County that an inmate had reported to Giles a statement that Greene allegedly made to the inmate. Specifically, Giles testified that Greene allegedly told the inmate that Greene would behave and there would be no trouble during trial up to the moment the jury announced its sentencing phase verdict, whereupon, if Greene received a death sentence, the sheriffs would have to kill Greene in the courtroom, and "that would be the end of it." After eliciting the testimony, the prosecutor asked Giles whether, as a result of the information, there were measures taken to secure Greene in the courtroom "that we haven't previously had in our part of the world." Giles answered in the affirmative, and no further evidence was offered regarding the measures which had been taken.

The majority holds that the testimony regarding Greene's alleged statements to the inmate was admissible not as hearsay but as original evidence to explain the conduct of the sheriff of Clayton County in taking security precautions. However, although out-of-court statements are sometimes admissible to explain the conduct or motive of a law enforcement officer, the conduct must involve matters relevant to the issues on trial. *Morris v. State*, 264 Ga. 823 (2) (452 SE2d 100) (1995); *Teague v. State*, 252 Ga. 534 (1) (314 SE2d 910) (1984). Although any actions of or threats made by Greene which might have prompted the sheriff to employ extreme security precautions might arguably be relevant to rebut testimony regarding Greene's good conduct, the sheriff's conduct in actually employing those measures was completely irrelevant, just as it would be if the sheriff had utilized extreme security measures in an abundance of caution with no basis to believe that they were warranted. Therefore, admission of the information that formed the basis of the sheriff's conduct cannot be justified on the ground that it was original evidence explaining his conduct.

Nor can admission be justified on the novel theory, never advanced by the state or trial court, that the testimony is not hearsay because it was offered to explain Greene's conduct. If the evidence was offered for that purpose, it had to have been offered to prove the

truth of the matter asserted, and it was therefore hearsay.

Finally, even if Greene's alleged statements were admissible to rebut testimony that Greene behaved himself in prison, the state could at best introduce the alleged statements through the inmate who, according to the sheriff, told him what Greene had allegedly said. Yet the state never even attempted to call the inmate as a witness. Therefore, Greene had no opportunity to impeach the inmate's credibility.

Testimony that Greene's dangerousness required unprecedented security measures was not only inadmissible under any theory, it was highly prejudicial. It is widely recognized that any extreme security measure which is visible to a jury, such as shackling, is inherently prejudicial and may not be implemented unless justified by an essential state interest after giving the defendant an opportunity to contest the information which is its basis. See *Holbrook v. Flynn*, 475 U. S. 560, 568-569 (106 SC 1340, 89 LE2d 525) (1986); *Elledge v. Dugger*, 823 F2d 1439, 1450-1452 (11th Cir. 1987), cert. denied, 485 U. S. 1014 (108 SC 1487, 99 LE2d 715). In this case, Greene had been fitted with a "stun" belt which was deliberately concealed under his clothing to avoid unfairly prejudicing Greene. The state had not attempted to show that an essential state interest required the use of security measures that would be visible to the jury, and it certainly made no showing that the jury needed to be informed of concealed security measures. Informing the jurors of the alleged *need* to employ extreme measures was far more prejudicial than merely permitting them to view shackles would have been, as the jurors might have assumed shackling was routine.

Testimony that Greene allegedly threatened violence in the courtroom, and that unprecedented security measures had been employed to control him, could reasonably have made the difference between a life or death sentence for Greene. Before the jurors heard the testimony, they likely believed that Greene's crimes were heinous but that they were part of an isolated spree when Greene was addicted to crack cocaine. After the improper testimony, the jurors likely viewed Greene as consistently and fundamentally violent, with or without drugs, and as a threat even to themselves.[3]

Because the evidence consisted of hearsay and testimony regarding matters wholly irrelevant to the issues at trial, all of which was so inherently prejudicial that it might well have determined the outcome of the sentencing phase, its admission mandates that Greene's death sentence be overturned. Therefore, I must respectfully dissent.

---

[3] The impact of this image was magnified by the prosecutor's improper references to the possibility that Greene would be released if sentenced to life in prison and would be a next door neighbor to someone, perhaps a juror. This issue is discussed in Division 4, infra.

3. In Division 26, the majority concludes, citing *Hill v. State*, 263 Ga. 37 (19) (427 SE2d 770) (1993), that because the prosecutor did not urge imposition of the death penalty based upon Greene's religious beliefs and did not specifically urge that the teachings of a particular religion mandate imposition of the death penalty, the prosecutor's religious arguments were not improper. However, the prosecutor did implicitly urge the jury that certain passages of the Bible, as interpreted by the Baptist faith, mandate imposition of the death penalty in this case. First, he informed the jury that he was "a plain old country Baptist." He then argued as follows:

> Let's get down to what this trial and what the laws are all about and this is retribution. An eye for an eye. A tooth for a tooth. Right there in the Bible with all those nice things that I'm sure that the lawyers over there . . . are going to be talking about. But no act in that Bible took those words out of it.
> And one more thing. Remember this, that that was a limiting, limiting liberal rule in the old testament. That is, if you and I had an eye taken out you could not take out two. It was not to be harsh but to be limiting, to be just. How do we put it now? Let the punishment fit the crime.

Later, the prosecutor argued:

> As you hear that word mercy there is one phrase from the Sermon on the Mount that I want you to hear at the same time. I'm not going to be able to come back and talk to you. But at the same time you hear those lawyers yell mercy hear blessed are the merciful for they shall obtain mercy. And you drank [sic] his whole and entire being and see if you can find a grain of mercy extended to anybody.

Thus, the prosecutor's arguments were improper under *Hill*. See 263 Ga. at 46 (19). Furthermore, *Hill* merely provides two examples of prohibited religious argument, not an exhaustive list. Neither it nor *Crowe v. State*, 265 Ga. 582 (18) (d) (458 SE2d 799) (1995), which involved a far less extensive religious reference in rebuttal to defense efforts to play on religious sentiments, limit our ability to find error in new prosecutorial approaches to religious discourse. Religion should not be urged, however cleverly, as a basis for a jury's sentencing decision in a death penalty trial. See, e.g., *Jones v. Kemp*, 706 FSupp. 1534, 1559 (N.D. Ga. 1989). See also *United States v. Giry*, 818 F2d 120, 133 (1st Cir. 1987) (prosecutor's reference to religion constituted irrelevant and inflammatory appeal to jurors' religious beliefs and warranted "especial condemnation"), cert. denied, 484 U. S. 855 (108

SC 162, 98 LE2d 116) (1987).

It is true that defense counsel did not object to the prosecutor's improper references to religion. However, the improprieties in this case were of such magnitude that there is a reasonable probability that they may have altered the outcome of the sentencing phase. See *Ford v. State*, 255 Ga. 81 (8) (i) (335 SE2d 567) (1985). The prosecutor did not stop at quoting Biblical text. Instead, he directed the jurors' attention to Biblical passages which, in context, are subject to varying interpretations, and, speaking with a voice of authority, interpreted them virtually to require imposition of the death penalty. Furthermore, he disparaged mercy as a valid sentencing consideration, thereby striking at "the most important component of a capital jury's discretion favoring capital defendants." See *Jones v. Kemp*, 706 FSupp. at 1560, citing *Wilson v. Kemp*, 777 F2d 621, 626 (11th Cir. 1985), cert. denied, 476 U. S. 1153 (106 SC 2258, 90 LE2d 703) (1986). Therefore, because of the impropriety of the prosecutor's argument, the sentence of death must be vacated, and I respectfully dissent.

4. In Division 23, the majority briefly dismisses Greene's contention that the prosecutor made improper references to parole, on the ground that Greene waived his rights by failing to move for a mistrial. I address this enumeration because I believe the prosecutor's misconduct in referring to parole likely contributed to the impact of the erroneous admission of the sheriff's testimony in determining the outcome of the sentencing phase of trial.

Pursuant to OCGA § 17-8-76 (a), no attorney shall argue to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury due to pardon, parole or clemency. If an attorney does so, opposing counsel may request a mistrial, in which case it is mandatory that the trial court grant the motion. See id. at (b). The statute proscribes all reference to parole. *Davis v. State*, 255 Ga. 598, 616 (25) (340 SE2d 869) (1986). Greene argues that his sentence must be reversed because the prosecutor made frequent references to parole, and the trial court failed to declare a mistrial.

During the cross-examination of Greene, the prosecutor asked Greene if he wanted to go to Georgia's electric chair. Greene testified that he did not. The prosecutor then asked Greene if he wanted to spend the rest of his life in the Georgia penitentiary. Greene responded, "Yes, sir, . . . I would appreciate that." The prosecutor reacted with disbelief, saying, "You want to? You're saying, gosh, please let me do that, I don't ever want to breathe a free breath?" Greene answered as follows:

> Well, you know, life in prison is better than death. You know what I'm saying? You will have, you might have an opportu-

nity to get out, you might not. But that's the chance you've got to take.

Having coaxed Greene into purportedly opening the door to testimony regarding the possibility of release, the prosecutor then asked Greene if he had told the deputy that when he "got out," he was going to buy himself a Nissan pickup truck. Then, the prosecutor asked Greene whether, "by one means or another . . . [he] want[ed] to get out where there are more knives and more dope." Later, the prosecutor asked, "You would reach for any straw that you could find to try to save your life so you could get out and get that Nissan pickup truck, wouldn't you?" Greene's attorneys did not object to any of the challenged questions.

In closing argument, the prosecutor asked the jurors whether Greene had given them "the slightest indication that this trial is anything more to him than some kind of hindrance between him and his Nissan pickup truck." Later, after informing the jury that there are knives and drugs in prison, the prosecutor asked the jurors to put themselves in the position of a young man who has made a mistake and gone to prison, is putting his life together, and is introduced to Greene as his new roommate. He then went on to argue:

> Put another way, so long as breath is in him he's going to be living next door to somebody. Do you want him living next door to you? What would you do if he came to your door with a butcher knife in his hands? Put it on a personal basis and then understand a little bit more about what he does.

Once again, the defense failed to object.

Although the prosecutor never specifically used the word "parole," his arguments and questions clearly were intended to refer to the possibility that the defendant "might not be required to suffer the full penalty imposed by the court." See OCGA § 17-8-76. The purpose of the statute prohibiting such remarks is to prevent prosecutors from urging the jury to give a more severe sentence to compensate for, or avert, possible pardon, parole or other clemency. See *Gilreath v. State*, 247 Ga. 814, 835 (15) (279 SE2d 650) (1981). "The jury should not be encouraged to recommend the death penalty because it fears that parole officials may grant parole if the defendant is given a life sentence." *Davis v. State*, 255 Ga. at 615 (25). In this case, the prosecutor clearly intended to urge the jury to sentence Greene to death lest he be released on parole. I am unpersuaded that Greene's concession on cross-examination, that he would not genuinely *like* to be incarcerated for the remainder of his life and would prefer to be freed

at some juncture, opened the door to the prosecutor's otherwise prohibited conduct. Nor am I persuaded that the prosecutor's juxtaposition of a discussion of prison roommates with an argument that Greene might someday live next door to a juror obscured the implication that Greene would be released someday if not sentenced to die. The prosecutor violated the spirit and letter of the law in maneuvering to introduce improper considerations in the sentencing phase of trial. The improper references to parole compounded the impact of the prosecutor's other misconduct and reinforce my conviction that the death sentence should be reversed.

For the foregoing reasons, I respectfully dissent. I am authorized to state that Justice Sears joins in this dissent.

SEARS, Justice, concurring in part and dissenting in part.

I join fully in the Chief Justice's partial concurrence and dissent. I write separately in order to call special attention to two serious concerns raised by the majority's affirmance of Greene's death sentence. First, in Division 2, the majority relies entirely upon the standard enunciated in *Wainwright v. Witt*[4] in dismissing Greene's argument that the trial court committed reversible error by dismissing five prospective jurors because they expressed varying degrees of opposition to the death penalty, without considering this Court's treatment of *Wainwright*. Our cases interpreting the *Wainwright* standard establish that a prospective juror may not be disqualified merely for stating on voir dire that they would have difficulty imposing the death penalty, that they have misgivings about the death penalty, or that they would tend to lean toward a life sentence.[5] The record of voir dire in this case, explained at length in the Chief Justice's opinion, makes it clear that under our case law interpreting *Wainwright*, each of the five prospective jurors was qualified to serve, and that the trial court committed reversible error in ruling otherwise.

Second, in Division 26 the majority opinion sanctions the State's use of certain religious teachings in arguing for the imposition of the death penalty, contrary to our law. In Georgia, it is improper to urge that the teachings of a particular religion command the imposition of the death penalty.[6] Rather, jurors must be charged with sentencing on the death penalty, as in all cases, in accordance with the laws of the

---

[4] 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985).

[5] See *Jarrell v. State*, 261 Ga. 880, 881 (413 SE2d 710) (1992); *Isaacs v. State*, 259 Ga. 717, 731 (386 SE2d 316) (1989); *Alderman v. State*, 254 Ga. 206, 207 (327 SE2d 168) (1985). See also *Witherspoon v. Illinois*, 391 U. S. 510, 522 (88 SC 1770, 20 LE2d 776) (1968) (quoted at p. 453 of the Chief Justice's opinion).

[6] *Hill v. State*, 263 Ga. 37, 45 (427 SE2d 770) (1993); *Evans v. Thigpen*, 809 F2d 239 (5th Cir. 1987), cert. denied, 483 U. S. 1033 (107 SC 3278, 97 LE2d 782) (1987).

State.[7] The prosecutor's direct references during closing argument to the Baptist faith, biblical commandments concerning retribution and mercy, and the Sermon on the Mount, all of which are quoted in the Chief Justice's opinion, constituted inflammatory appeals to the private religious beliefs of the jurors, and therefore were improper.[8] Such comments are especially unjustifiable coming from a State's attorney, "whose duty is as much to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one."[9]

DECIDED MARCH 15, 1996 —
RECONSIDERATION DENIED MARCH 28, 1996.

*William L. Kirby II, Charlotta Norby, Stephen B. Bright, Herbert L. Wells,* for appellant.

*Douglas C. Pullen, District Attorney, J. Gray Conger, Lori L. Canfield, Assistant District Attorneys, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,* for appellee.

