### S94P0681. HITTSON v. THE STATE.
(449 SE2d 586)

THOMPSON, Justice.

Travis Clinton Hittson was convicted of the malice murder of Conway Utterbeck, as well as counts of aggravated assault, theft by taking and possession of a firearm during the commission of a crime. The jury found that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind, OCGA § 17-10-30 (b) (7), and recommended that Hittson be sentenced to death. The trial court sentenced Hittson to death for the murder and to terms of years for the remaining convictions.[1]

On April 3, 1992 Hittson, his co-defendant Edward Vollmer, and the victim, Conway Utterbeck, left Pensacola, Florida, where they were stationed on the U.S.S. Forrestal, and they drove to the home of Vollmer's parents in Warner Robins, Georgia. The elder Vollmers were out of town, and the three men spent the first night in a shed on the property. They obtained a key to the house from a family friend the following day. According to statements Hittson subsequently made to law enforcement officers, on the second day of the trip he and Vollmer went to several bars, leaving the victim at the Vollmers' home. As they drove back to the house, Vollmer stated that the victim planned to kill them, and they should "get" him first. Vollmer gave Hittson an aluminum baseball bat and the two entered the house to find the victim dozing. Hittson stated that, at Vollmer's direction, he struck the victim several times in the head with the baseball bat, then dragged him into the kitchen where Vollmer waited. According to Hittson, the victim screamed, "Travis, whatever have I

---

[1] The crimes occurred on April 4, 1992. A portion of the victim's remains was discovered on June 16, 1992, leading to the defendant's indictment on June 30, 1992. Trial was held during February 1993, and the defendant was sentenced on March 17, 1993. His motion for new trial was denied on December 7, 1993, and his case was docketed in this court on February 3, 1994. Extensions of time were granted by this court and the defendant's case was orally argued on May 9, 1994.

did to you?" While Vollmer stepped on the victim's hand, Hittson shot him in the head. Hittson stated that he was "cold" and "had no emotion" when he shot the victim.

According to Hittson's statement, approximately two hours later Vollmer stated that they needed to dismember the body in order to get rid of the evidence. Hittson stated that they used a hacksaw to remove the victim's hands, head and feet, but that he became sick after he removed a hand, and Vollmer completed the dismemberment. Hittson stated that Vollmer acted alone in removing the victim's genitals and carving out his rectum. Vollmer and Hittson then packed the victim's remains in numerous garbage bags. They buried the victim's torso in Houston County, cleaned up the Vollmers' home, and hid the baseball bat in the Vollmers' shed. Subsequently they drove back to Pensacola where they buried the rest of the victim's remains.

On April 5, 1992, Louise Davidson observed a black Thunderbird with Florida license plates emerging from a seldom used dirt road in Houston County. Two people were in the car. Suspicions were aroused, and she noted the license number. When the victim's torso was discovered two months later by loggers in an area off the same dirt road, police determined that the car previously observed by Davidson belonged to Edward Vollmer.

Relying on information that the victim had gone to Warner Robins just before his disappearance, the Navy contacted the Houston County Sheriff's Department. Representatives of the Sheriff's Department travelled to Pensacola, Florida, and, along with agents from the Naval Investigative Service (NIS), interviewed a number of the victim's shipmates, including Hittson. Hittson subsequently confessed and gave information leading to the discovery of the rest of the victim's remains.

At Hittson's trial the medical examiner testified that, in his opinion, the victim died from a single gunshot wound to the head, but that it was not possible to determine whether the dismemberment occurred before or after death.

1. A rational trier of fact could have found Hittson guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Prior to trial, defense counsel successfully petitioned the trial court for funds to conduct a psychological examination. Following this examination, Hittson filed a notice of intent to raise the issues of insanity or mental incompetency. The trial court then ordered a mental evaluation of Hittson by the state's expert on the issues of criminal responsibility and mental competency. At a hearing prior to this evaluation, the parties and trial court engaged in an extensive discussion of the procedures to be followed during this examination.

The trial judge agreed that defense counsel could be present during the state's evaluation and informed the parties that he would be available if problems arose during the course of the evaluation. Further, the court informed defense counsel that if there were problems with the issues the psychologist was exploring, the defense could call a halt to the proceedings, but that to do so "gets close to the line of being uncooperative."

At the beginning of the evaluation, the state's psychologist administered *Miranda* warnings, informing Hittson that he had the right to refuse to answer questions about his case, and that anything he said during the evaluation could be used against him during the trial of the case or during sentencing. Hittson stated that he understood the warnings and signed a waiver of rights form. Hittson's counsel was not present while the warnings were administered but arrived during the evaluation. However, the state psychologist testified that defense counsel was present on the second day of the evaluation when *Miranda* warnings were again administered, as well as when Hittson made certain statements criticizing the victim.

During the sentencing phase of trial the defense offered in mitigation the testimony of one of Hittson's shipmates that Hittson had admitted killing the victim, but that he seemed to feel remorse. To rebut this testimony the state called its psychologist who testified that when asked to characterize the victim, Hittson called him a "hillbilly" and a profane name. The state's expert did not testify to any of the results of his evaluation of Hittson or to any facts relating to the crime which Hittson may have revealed to him.

Hittson argues that the psychologist's testimony violated his Fifth Amendment right against self-incrimination. We disagree.

Custodial communications made to a court-appointed mental health expert are testimonial in nature, and, generally, must be preceded by *Miranda* warnings for the defendant's statements to be admissible during the state's case-in-chief or sentencing phase of trial. *Estelle v. Smith*, 451 U. S. 454, 467-469 (101 SC 1866, 68 LE2d 359) (1981); *Buchanan v. Kentucky,* 483 U. S. 402, 422 (107 SC 2906, 97 LE2d 336) (1987).

In this case defense counsel had notice of the evaluation and were aware that they could be present throughout the proceedings. The record supports the trial court's finding that *Miranda* warnings were properly administered, that Hittson voluntarily waived his right to remain silent, and that he willingly participated in the evaluation. The record does not support Hittson's contention that he waived his Fifth Amendment privilege only to the extent of permitting an evaluation to rebut a possible insanity defense. Nor does the record support Hittson's contention that the trial court's rulings prevented defense counsel from objecting to any part of the evaluation. As we read

the record, the trial court correctly cautioned defense counsel that refusing to submit to the examination could result in the striking of the testimony of Hittson's own mental health expert. *Strickland v. State*, 257 Ga. 230 (5) (357 SE2d 85) (1987).

Further, the state psychologist's request that Hittson characterize the victim did not exceed the scope of the court-ordered evaluation. *Christenson v. State*, 261 Ga. 80, 84 (402 SE2d 41) (1991). Admission of Hittson's *Mirandized* statements to rebut a claim of remorse was proper. *Harris v. Pulley*, 692 F2d 1189 (9th Cir. 1982); *Hicks v. State*, 256 Ga. 715 (14) (352 SE2d 762) (1987).

3. We agree with the state that the trial court's order identifying the scope of mental evaluation to be made by the state's expert coupled with the extensive discussion of this matter at a hearing prior to the evaluation adequately put defense counsel on notice as to the scope and nature of the proceeding. The trial court left to defense counsel the decision of whether to be present during the evaluation, and it is undisputed that defense counsel chose to be present during most of the two-day evaluation. The trial court further made it clear that if issues regarding the scope and nature of the evaluation arose, it would be available throughout the course of the evaluation to make rulings. The record also shows that at least one defense attorney counseled Hittson prior to the evaluation.

Under these circumstances, Hittson's Sixth Amendment right to counsel was not violated within the meaning of *Estelle v. Smith*, supra.

4. Hittson argues that his due process rights were violated because the trial court did not inform him that the state's psychologist would be permitted to testify to issues other than mental competency and criminal responsibility. Contrary to Hittson's assertions, the trial court did not limit the issues upon which the state's expert would be permitted to testify. Further, both the oral warnings and the signed waiver form notified Hittson that anything he said to the psychologist could be used against him during the state's case-in-chief or during the sentencing phase of trial. Finally, because defense counsel was present when Hittson made the statements in question, he may not claim surprise at the content of the psychologist's testimony.

5. During the sentencing phase of trial, the defense proffered the testimony of Mary Shultz, a social worker with a master's degree who had interviewed Hittson's family, friends and teachers. Shultz stated that her testimony would concern Hittson's family history, substance abuse, IQ, and childhood, all of which explains his behavior. Following this proffer, defense counsel sought a ruling on whether the state would be able to rebut Shultz's testimony with testimony of a psychologist or psychiatrist.

The trial court ruled that, to the extent that Shultz attempted to

testify to Hittson's "psychological behavior" or "mental state," the state would be permitted to put up its own expert to testify "based on the same factors that [Shultz] cited."

Defense counsel did not offer the testimony of Shultz at the sentencing trial and now argues that the trial court's ruling prevented the defense from offering relevant mitigating evidence. We do not agree.

The trial court did not rule that any portion of Shultz's testimony was inadmissible; rather, it ruled that any expert testimony given by Shultz with regard to psychological behavior and mental state could be rebutted by the state's expert. This ruling was not in error. Hittson was not, as he suggests, restricted in presenting evidence of his family history or substance abuse. This evidence was, in fact, testified to by a number of Hittson's childhood friends.

6. Hittson maintains the trial court committed several errors in conducting the voir dire.

(a) He first argues that the trial court erred in refusing to allow him to "explore" a prospective juror's "feelings about the issue of a life sentence and parole." The record shows that the juror in question stated that when he was a child, his father had been murdered and the killer had been paroled after a short period of time. The trial court informed the juror that there were only two sentencing alternatives available in this case, a life sentence or the death penalty, and inquired whether the juror could consider, for the purposes of this proceeding, that "a life sentence means a life sentence." The juror replied that he would. The trial court did not err in limiting further questioning on this issue. *Davis v. State*, 263 Ga. 5 (7) (426 SE2d 844) (1993); *Spivey v. State*, 253 Ga. 187, 193 (6) (a) (319 SE2d 420) (1984).

(b) Contrary to Hittson's assertion, the trial court did not unduly restrict his questioning of prospective juror Marchman as to whether he would vote to impose the death penalty for an intentional killing. Instead, the court ruled that this question should not be asked in a vacuum but should be asked in the context of other questions concerning mitigating and aggravating circumstances and the juror's ability to follow the trial court's instructions. We find no reversible error.

(c) The trial court did not prohibit Hittson from inquiring whether prospective jurors would vote to impose the death penalty in a case of mutilation.

(d) The trial court did not err in prohibiting Hittson from asking prospective jurors "under what circumstances" the death penalty should be imposed. *Isaacs v. State*, 259 Ga. 717, 731 (24) (386 SE2d 316) (1989).

(e) The record does not support Hittson's contention that the trial court refused to allow him to ask prospective jurors whether they

would consider evidence of intoxication in mitigation.

(f) Citing *Lynd v. State*, 262 Ga. 58 (414 SE2d 5) (1992) (Benham, J., concurring specially), Hittson contends that the trial court was not even-handed in its treatment of prospective jurors Conine and Minchew. Conine stated that a murder in which mutilation was involved was the "type of crime" for which he thought the death penalty should be imposed; however, he also stated that he had an "open mind" and could not make a decision before he heard the evidence. Prospective juror Minchew stated that he was not morally capable of returning a death sentence and that he would be violating God's law if he did so. He further stated that he would follow God's law rather than the trial court's instructions.

The trial court denied Hittson's motion to excuse Conine and granted the state's motion to excuse Minchew. As this is the only disparate treatment of these jurors shown by the record, we find no error.

The record does not support Hittson's contention that his voir dire of prospective juror Conine was curtailed by the trial court. Nor does the record show that the trial court attempted, in any manner, to rehabilitate Conine.

(g) The voir dire, which lasted eight days and fills more than 2,000 pages of transcript, was sufficiently broad to permit the defense to determine the impartiality and fairness of the prospective jurors.

> While some of the questions excluded by the trial court, if minutely parsed and rigorously analyzed, arguably could have been allowed, nonetheless the questions that were allowed were more than ample to allow the discovery of bias, prejudice and prior opinion.

*Curry v. State*, 255 Ga. 215, 218 (2) (b) (336 SE2d 762) (1985).

(h) Last, Hittson argues the trial court erred in failing to remove six jurors for cause. As prospective jurors Conine and Hatfield were qualified 43rd or later in the panel, any error in refusing to excuse them is harmless. *Pope v. State*, 256 Ga. 195, 202 (7) (e) (345 SE2d 831) (1986). The record does not show that Hittson moved to strike prospective juror Willis for cause and the trial court did not err in failing to excuse this juror sua sponte. *Todd v. State*, 261 Ga. 766, 770 (5) (410 SE2d 725) (1991).

Hittson alleges that prospective jurors Byars, Dawson and Maze indicated that they would not fairly consider the imposition of a life sentence. He also alleges that Dawson and Willis stated they would not consider relevant mitigating factors at trial.

While there is some equivocation in the responses of each of these jurors as to whether they would automatically vote to impose

the death penalty, as well the degree of consideration they would give evidence of substance abuse in mitigation, the record supports the trial court's findings that each was capable of serving as an impartial juror and would consider both evidence in mitigation and the option of a life sentence. These findings are entitled to deference from this court. See, e.g., *Ledford v. State*, 264 Ga. 60 (6) (b) (439 SE2d 917) (1994); *Jefferson v. State*, 256 Ga. 821, 824 (2) (353 SE2d 468) (1987).

7. We find no error in the trial court's charge on mitigating circumstances. *Ross v. State*, 254 Ga. 22 (6) (326 SE2d 194) (1985). The trial court was not required to illustrate possible mitigating circumstances for the jury. *Frazier v. State*, 257 Ga. 690 (22) (362 SE2d 351) (1987).

8. Hittson complains that his sentence of death is disproportionate to the life sentence given Edward Vollmer, his co-defendant. In his statement to law enforcement officers Hittson admitted striking the victim with a baseball bat, taking a gun Vollmer offered him, and shooting the victim in the head. Hittson assisted Vollmer in dismembering and burying the body, as well as concealing the crimes. Given Hittson's degree of participation in the crimes, we are unable to say that his sentence of death is disproportionate to Vollmer's life sentence. *McClesky v. State*, 245 Ga. 108, 115 (263 SE2d 146) (1980); *Collins v. State*, 243 Ga. 291, 299-300 (253 SE2d 729) (1979).

Nor is Hittson's death sentence disproportionate to sentences imposed in comparable cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). See Division 16, infra, and the Appendix to this opinion.

9. Hittson argues that because the state provided him with a copy of his statements to the state psychologist less than ten days prior to trial, under OCGA § 17-7-210 (c), the trial court should not have permitted the psychologist to testify to Hittson's characterization of the victim. However, defense counsel failed to object on this ground until after the state psychologist had testified, thus waiving any error in noncompliance with the statute. *Huguley v. State*, 253 Ga. 709, 710 (324 SE2d 729) (1985).

Hittson's *Brady* motion did not entitle him to a copy of his own inculpatory statement. *McCarty v. State*, 249 Ga. 618, 620 (292 SE2d 700) (1982). Further, Hittson has made no showing that other items sought under his *Brady* motion were exculpatory.

10. On June 25, 1992, following the discovery of the victim's torso in Houston County, a NIS agent escorted Hittson off ship for an interview with Escambia County, Florida, and Houston County, Georgia law enforcement officers in connection with the victim's disappearance. The record shows that some of Hittson's shipmates were similarly interviewed that day and that the NIS followed the same procedure in each case. Hittson was read his rights under Article 31 (b) of

the Uniform Code of Military Justice, informing him of his right to remain silent, his right to an appointed military lawyer, and cautioning him that anything he said could be used against him in a military or judicial proceeding. Hittson subsequently confessed to the murder.

(a) Hittson first argues that his confession was the product of an arrest lacking probable cause in violation of the Fourth Amendment, and that the trial court erred in denying his motion to suppress the statements. The trial court found that Hittson was not in custody at the time of his confession, but that even if the interview was of a custodial nature, there was probable cause to arrest Hittson. Because we conclude that the record supports the trial court's finding that Hittson was not in custody, *Lobdell v. State*, 256 Ga. 769 (6) (353 SE2d 799) (1987), we find it unnecessary to determine whether there was probable cause to arrest him.

As stated above, the record shows that other witnesses being interviewed in connection with the victim's disappearance were not in custody and were being treated no differently than Hittson. Further, the NIS agent who transported Hittson to the interview testified that had Hittson left the interview, he would have been required to return only if his commanding officer ordered him to do so. The record affirmatively shows that Hittson was not restrained in any manner.

(b) The Article 31-B rights read to Hittson satisfied *Miranda* requirements. *Burger v. State*, 242 Ga. 28 (3) (247 SE2d 834) (1978). The record supports the trial court's finding that Hittson voluntarily waived these rights prior to confessing.

11. Photographs of the victim's remains admitted in evidence were probative of issues relevant to the trial of the case. *Bullard v. State*, 263 Ga. 682 (5) (436 SE2d 647) (1993). That the alterations to the victim's body were due to the "combined forces of the murderer and the elements" does not render the photographs inadmissible. *Baxter v. State*, 254 Ga. 538, 544 (331 SE2d 561) (1985). Further, the record shows that the trial judge personally cropped a number of photographs of the victim prior to admitting them in order to make them less objectionable. We find no error.

12. One month before trial was scheduled to begin, Hittson moved to continue the case for an indefinite period of time in order to further investigate the evidence and interview witnesses. The trial court continued the case for an additional two weeks, and Hittson did not object or thereafter request additional time. Hittson has failed to show that the trial court abused its discretion in failing to grant a further continuance for an unspecified time. *Rivers v. State*, 250 Ga. 303 (5) (298 SE2d 1) (1982).

13. Hittson argues the district attorney improperly inflamed the jury during closing arguments in the sentencing phase of trial and

misled the jury with an incorrect statement of law in the guilt-innocence phase.

Because Hittson failed to object to the district attorney's closing argument at either phase of trial, the standard of review is whether there is a reasonable probability that the argument changed the result of the trial. *Todd v. State*, 261 Ga. 766 (2) (410 SE2d 725) (1991); *Ledford v. State*, 264 Ga., supra.

Any misstatement by the district attorney with regard to voluntary intoxication as a defense to a crime was corrected by the trial court's charge. There exists no reasonable probability that the outcome of the trial was changed either by the prosecutor's comparison of the defendant's rights at the time of trial to the victim's rights at the time of the crime, see *Jarrell v. State*, 234 Ga. 410 (11) (216 SE2d 258) (1975), or the prosecutor's brief reference to the photographs of the victim's remains.

14. (a) While deliberating following the sentencing phase of trial, the jury twice inquired of the trial court whether Hittson would have an opportunity for "freedom" or parole if sentenced to life imprisonment. The trial court informed the jury that a life sentence meant the defendant would serve the remainder of his life in the penitentiary.

Hittson now argues that the trial court's response was improper. However, on both occasions defense counsel stated he had no objections to the substance of the trial court's instruction, and Hittson may not now object on appeal. *Martin v. State*, 262 Ga. 312 (2) (418 SE2d 12) (1992). Further, the trial court's response to the jury's inquiry was not erroneous. *Curry v. State*, 255 Ga. 215, 223 (336 SE2d 762) (1985).

(b) Nor did the trial court err in instructing that the jury could "recommend" the imposition of the death penalty since the charge made it clear that such a recommendation would be binding. *Holiday v. State*, 258 Ga. 393 (19) (a) (369 SE2d 241) (1988).

15. In *Hardwick v. State*, 264 Ga. 161 (442 SE2d 236) (1994), this Court held that USCR 19.2 (B) is unenforceable, absent consent of the parties, because it conflicts with OCGA § 17-7-150 (a). Hittson asserts that the trial court erred in selecting the jury from Glynn County, but holding trial in Houston County pursuant to USCR 19.2 (B). The record shows that Hittson objected to the trial court's ruling implementing the procedure in USCR 19.2 (B), on the grounds that the Glynn County jury might be exposed to pre-trial publicity in Houston County and that being so far from home might cause jurors to rush to a verdict. However, this contention was not raised on appeal until three days prior to oral argument.

Except in cases of "plain error," assertions of error not timely raised on appeal are deemed waived. UAP, § IV (B) (2); *Lynd v.*

*State*, 262 Ga. 58, 60 (414 SE2d 5) (1992). We have defined "plain error" as that which is " 'so clearly erroneous as to result in a likelihood of a grave miscarriage of justice' or which 'seriously affects the fairness, integrity or public reputation of a judicial proceeding.' " Id. at 61, n. 2.

We conclude that returning the jury to Houston County for trial in this case did not amount to "plain error." The record does not show that adverse pre-trial publicity infected the jury; nor is there any indication that the jury failed in its duties because of separation from family and home during the trial.

16. The evidence supports the jury's finding of the (b) (7) aggravating circumstance. We conclude that Hittson's sentence was not imposed as the result of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). Hittson's death sentence is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Black v. State*, 261 Ga. 791 (410 SE2d 740) (1991); *Hall v. State*, 261 Ga. 778 (415 SE2d 158) (1991); *Todd v. State*, 261 Ga. 766 (410 SE2d 725) (1991); *Conklin v. State*, 254 Ga. 558 (331 SE2d 532) (1985); *West v. State*, 252 Ga. 156 (313 SE2d 67) (1984); *Cervi v. State*, 248 Ga. 325 (282 SE2d 629) (1981); *Baker v. State*, 243 Ga. 710 (257 SE2d 192) (1979); *Stanley v. State*, 240 Ga. 341 (241 SE2d 173) (1977).

DECIDED OCTOBER 31, 1994 —
RECONSIDERATION DENIED DECEMBER 1, 1994.

*Stephen N. Hollomon, Williams, Sammons & Sammons, Walter G. Sammons, Jr.,* for appellant.

*Edward D. Lukemire, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige M. Reese, Assistant Attorney General,* for appellee.