## S95P1366. GREENE v. THE STATE.
### (485 SE2d 741)

CARLEY, Justice.

A jury found Daniel Greene guilty of murder, armed robbery and aggravated assault. The jury also found, as an aggravating circumstance, that Greene committed the murder during the course of an armed robbery and, based upon that finding, the jury imposed a death sentence for the murder. For the armed robbery, Greene received a life sentence and, for the aggravated assault, a 20-year sentence.

Greene appealed and, in one of his enumerations, he asserted that the trial court erred by excusing five prospective jurors for cause based upon their opposition to the death penalty. *Greene v. State*, 266 Ga. 439, 440 (2) (469 SE2d 129) (1996). In addressing this enumeration, we initially noted that *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985) "is the controlling authority as to the death-penalty qualification of prospective jurors. . . ." *Greene v. State*, supra at 440 (2). In the course of our subsequent review of the trial court's specific rulings on the exclusion of the five prospective jurors, we also cited *Wainwright v. Witt* as "controlling authority." *Greene v. State*, supra at 441 (2). Our ultimate conclusion was that "the trial court's finding that the prospective jurors were disqualified must be affirmed." *Greene v. State*, supra at 442 (2). Only Chief Justice Benham and Justice Sears dissented, urging that the trial court erred in finding the prospective jurors were disqualified under the standard established by *Wainwright v. Witt*.

The Supreme Court of the United States granted Greene's petition for a writ of certiorari. *Greene v. Georgia*, 519 U. S. __ (117 SC 578, 136 LE2d 507) (1996). The Supreme Court held that this Court "correctly recognized that [*Wainwright v.*] *Witt* is, 'the controlling authority as to the death[-penalty] qualification of prospective jurors. . . .' [Cit.]" *Greene v. Georgia*, supra at 578-579. However, the Supreme Court also held that *Wainwright v. "Witt* is not 'controlling authority' as to the standard of review to be applied by state appellate courts reviewing trial courts' rulings on jury selection." *Greene v. Georgia*, supra at 579. "[T]he Supreme Court of Georgia is free to adopt the rule laid down in [*Wainwright v.*] *Witt* for review of trial court findings in jury-selection cases, but it need not do so." *Greene v.*

*Georgia,* supra at 579. Accordingly, the Supreme Court reversed the judgment in *Greene v. State,* supra, and remanded the case to us for further proceedings not inconsistent with its opinion. Pursuant to that mandate, we now reconsider the issue of the disqualification of the five prospective jurors.

The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt,* supra at 424 (II). This standard does not require that a juror's bias be proved with " 'unmistakable clarity.' " *Ledford v. State,* 264 Ga. 60, 64 (6) (439 SE2d 917) (1994). Despite a lack of clarity in the record, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt,* supra at 425-426 (II). "As the U. S. Supreme Court has recognized, 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear." . . .' [Cit.]" *Ledford v. State,* supra at 64 (6). Here, the trial court found that the views on capital punishment held by the five prospective jurors were such as to disqualify them. The issue before us is whether the trial court was authorized to find that the prospective jurors' views would prevent or substantially impair the performance of their duties in accordance with their instructions and oaths.

In *Wainwright v. Witt,* the Supreme Court also held that, under 28 USC § 2254 (d), a federal court must give deference to a state trial court's finding of prospective juror bias. As noted, we are not *bound* by that additional holding in *Wainwright v. Witt,* since this Court is not a federal court which conducts a habeas corpus review of a state trial court's findings pursuant to 28 USC § 2254 (d). Nevertheless, we do apply the *Wainwright v. Witt* standard of review because this Court previously has adopted it as the controlling law of Georgia.

> It is because veniremembers "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings(,)" [cit.], that deference must be paid to the trial court's determination of whether the views of a prospective juror will "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [Cits.]

*Ledford v. State,* supra at 64 (6). See also *Crowe v. State,* 265 Ga. 582, 588 (9) (a) (458 SE2d 799) (1995); *Hittson v. State,* 264 Ga. 682, 688

(6) (h) (449 SE2d 586) (1994); *Thornton v. State*, 264 Ga. 563, 573 (13) (b) (449 SE2d 98) (1994); *Potts v. State*, 261 Ga. 716, 722 (8) (410 SE2d 89) (1991); *Wade v. State*, 261 Ga. 105, 108 (9) (401 SE2d 701) (1991); *Spencer v. State*, 260 Ga. 640, 641 (1) (c) (398 SE2d 179) (1990); *Isaacs v. State*, 259 Ga. 717, 730 (22) (386 SE2d 316) (1989); *Childs v. State*, 257 Ga. 243, 249 (7) (357 SE2d 48) (1987); *Jefferson v. State*, 256 Ga. 821, 824 (2) (353 SE2d 468) (1987). Accordingly, we must now determine whether the trial court erred in excusing the five prospective jurors, giving to the trial court's findings the deference to which they are entitled under the controlling law of this state. In so doing, we hereinafter paraphrase *Greene v. State*, supra at 440-442 (2), applying the same legal principles as were originally applied therein, but relying now upon only controlling Georgia authority.

Under that controlling Georgia authority, our review of the trial court's disqualifications of the prospective jurors must be based upon a consideration of the voir dire as a whole. *Crowe v. State*, supra at 588 (9) (a); *Spivey v. State*, 253 Ga. 187, 197, fn. 3 (319 SE2d 420) (1984). Although a prospective juror gives answers which, standing alone, might indicate that his or her opposition to the death penalty is not "automatic," this is not decisive. *Alderman v. State*, 254 Ga. 206, 207 (4) (327 SE2d 168) (1985). "A trial court's determination of a potential juror's ability to serve is not limited to the juror's opinion of his own impartiality. [Cit.]" *Burgess v. State*, 264 Ga. 777, 781 (7) (450 SE2d 680) (1994). Moreover, it is immaterial that the disqualification of a prospective juror does not appear with "unmistakable clarity."

> As has been pointed out, " 'determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.' [Cit.] Often, the answers of a prospective juror will to some degree be contradictory. [Cit.]" [Cit.]

*Jefferson v. State*, supra at 823 (2). The relevant inquiry on appeal is whether the trial court's finding that a prospective juror is disqualified is supported by the record as a whole. See *Crowe v. State*, supra at 588 (9) (a); *Taylor v. State*, 261 Ga. 287, 292 (5) (404 SE2d 255) (1991); *Spivey v. State*, supra at 197 (6) (d), fn. 3. An appellate court should not substitute its own finding for that of the trial court, since it must pay deference to the trial court's determination. See *Ledford v. State*, supra at 64 (6); *Jefferson v. State*, supra at 823 (2). This deference encompasses the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. See *Burgess v. State*, supra at 780 (6); *Ledford v. State*, supra at 64 (6) (b); *Isaacs v. State*, supra at 730 (21); *Jefferson v. State*, supra at 823 (2).

Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion. *Diaz v. State*, 262 Ga. 750, 752 (2) (425 SE2d 869) (1993).

### Prospective Juror Irma Miller

Ms. Miller initially stated that she was conscientiously opposed to the death penalty in "some cases." She then said that she would not vote for that punishment in any case. However, she next appeared to equivocate, stating that she did not "really know" whether she would never vote for the death penalty. Nevertheless, she thereafter affirmed that, even if she believed the death penalty was the most appropriate sentence, she could not vote for that penalty "no matter, regardless of what the facts and circumstances showed in the case" and that she did not think she could ever vote for that sentence. Eventually, she appeared to equivocate yet again, conceding that "there are certain circumstances where it might be necessary that we vote for the death penalty" and that she "probably would vote for the death penalty." However, she concluded her voir dire by admitting that she was "ninety percent" opposed to the death penalty and committed to the belief that only God should take a life.

At best, Ms. Miller gave conflicting and equivocal answers regarding her views on the death penalty. Because Ms. Miller appears to have been unable to articulate her true feelings, deference must be paid to the trial court's assessment of her qualification. This deference extends to the trial court's resolution of the conflicts and equivocations in Ms. Miller's voir dire. Considering Ms. Miller's voir dire as a whole and giving the requisite deference to the trial court's findings, we conclude that the trial court was authorized to find that the thoughts she expressed on the death penalty conveyed the impression that she would be unable to apply the law faithfully and impartially and that she was, therefore, subject to disqualification.

### Prospective Juror Linda McDougal

Although Ms. McDougal began her voir dire by stating that she was not conscientiously opposed to the death penalty, she did admit, upon further examination, that she "truly" could not "say at this time" that she could vote for that penalty. Only when subsequently pressed did she state that she could vote for the death sentence. However, then she admitted that she leaned toward a life sentence and "truly" did not know whether that leaning would interfere with her decision to vote for a death sentence. Thereafter, Ms. McDougal gave answers which seem to indicate that she was qualified, but she eventually began weeping and finally acknowledged that she was not

unbiased and "would hate to be involved in putting a man to death."

Ms. McDougal's responses were conflicting and equivocal and she had some difficulty expressing her true feelings regarding the death sentence. Having seen Ms. McDougal and heard the entirety of her voir dire, however, the trial court was authorized to find that, if faced with imposing the death sentence, she would respond on the basis of her emotional aversion to that sentence, rather than in accordance with her instructions and oath.

### Prospective Juror Alicia Oden

Ms. Oden began her voir dire by acknowledging that she was conscientiously opposed to capital punishment. Although she did state that she would vote for the death penalty in some circumstances, she nevertheless expressed some "serious concerns" about that penalty. Those "concerns" took the form of the religious "price" she "would have to pay for partaking in something that resulted in someone else's life being taken." When asked whether she could set aside her religious beliefs, Ms. Oden did not respond. When pressed, however, she stated that she "would *try* to follow the orders of the court." (Emphasis supplied.) A more definite response was requested and Ms. Oden admitted that she "would *not* be able to. I *cannot* say definitely that I would be able to." (Emphasis supplied.) Thereafter, she appeared to equivocate and gave some responses which indicated that she was qualified. However, she then reiterated that she had a "feeling against the death penalty," but would "try to be fair." Finally, she acknowledged a "semi" strong leaning against the death penalty which was "going to come with" her into the jury room.

From the entirety of Ms. Oden's voir dire, it is apparent that the trial court was authorized to find that she harbored a strongly held religious aversion to the death penalty. Indeed, she frankly questioned her own ability to adhere to the instructions of the court, rather than to her beliefs. She could state only that she would "try to be fair" and she further qualified that statement by acknowledging that her religious beliefs would still be with her in the jury room. Having seen and heard Ms. Oden, the trial court was authorized to form the impression that, based upon her religious views in opposition to the death penalty, she would be unable to apply the law.

### Prospective Juror Bendolyndo Bady

When asked if she was conscientiously opposed to the death penalty, Ms. Bady replied that she never in her "heart felt like that you should take one life for another. So, you know, it's kind of hard for me to answer." However, she thereafter did state that she could vote for the death penalty in some circumstances. Nevertheless, when she

52

subsequently was asked again whether she could vote for the death penalty, she equivocated and stated: "I don't know. I can't say yes to that one." Finally, she admitted that it would "be hard for me to do it. I guess my answer would have to be *no*." (Emphasis supplied.) Nevertheless, she then gave yet another set of responses which seemed to indicate that she was qualified. When asked about the conflict in her responses, Ms. Bady stated that, although it would be difficult, she would, if "convinced," vote for the death penalty. However, she thereafter stated that she "would rather go for a life sentence than the death penalty" and that this was a "strongly held belief." According to Ms. Bady, she believed that the jury should not take another's life and her belief in this regard was a part of her "makeup." Her personal belief about the death penalty was so strong that she could not be talked out of it by the attorneys.

The trial court was authorized to find that Ms. Bady held a strong personal aversion to the death penalty and was uncertain as to whether she could actually vote to impose that sentence. In order for Ms. Bady to be qualified, she would have to be willing to set aside her own strong personal feelings and follow, instead, her instructions and oath. However, she acknowledged that her belief was strong and that she could not be talked out of it by the attorneys. If she could not be talked out of her strongly held belief by the attorneys, the trial court was not required to believe that she nevertheless could set aside her belief and follow her instructions and oath instead. To the contrary, the trial court was authorized to believe that portion of Ms. Bady's voir dire wherein she acknowledged that she would not vote for the death penalty. Consequently, the trial court was authorized to determine from the content and tenor of Ms. Bady's responses that she would be unable to apply the law, rather than follow her own personal belief.

### Prospective Juror Betty Ann Sims

Ms. Sims began her voir dire by stating that she was not conscientiously opposed to the death penalty. However, when asked specifically whether she would vote for that penalty if authorized by the charge and the evidence, she stated that she did not think that she could. When asked about this conflict, she replied that she did not "really think [she] could put a person in the electric chair. . . . [She did not] think [she] could go along with that . . . . Maybe [she] didn't understand [the] first question." Upon further questioning, she then stated that she was so conscientiously opposed to the death penalty that she did not think that she could vote for that penalty under any circumstances. However, she then stated that she "probably could" vote for the death penalty "under some circumstances." Thereafter,

she gave a series of responses which seem to indicate that she was qualified. However, she eventually acknowledged that it was "probably so" that she would always vote for a life sentence rather than the death penalty. She then admitted that she could not be talked out of her opposition to the death penalty. She continued to give equivocal answers and eventually admitted that she did not know whether she could vote for the death penalty even "assuming that evidence was produced to [her] which would cause [her] to believe that the death penalty was the best sentence, the proper sentence to be imposed . . . ." However, she followed this by giving a series of responses which seemed to indicate that she was qualified. However, when asked whether she would impose the death sentence if convinced that the circumstances warranted that sentence, she could only give a qualified answer to the effect that she "guess[ed] so."

The transcript of Ms. Sims' voir dire shows conflict with regard to her views on the death penalty. In resolving the conflicts and equivocations in Ms. Sims' responses, the trial court was authorized to conclude that she was disqualified, since she could not affirm that she was unbiased against the death penalty and could, at best, state only that she "probably could" be fair and could only "guess" that she would vote for the death penalty even though convinced that it was the proper sentence.

As support for his contention that the trial court's findings must be reversed, Greene cites *Jarrell v. State*, 261 Ga. 880, 881 (1) (413 SE2d 710) (1992) and urges that the five prospective jurors were disqualified merely because they harbored "qualms" about the death penalty or "leanings" toward a life sentence. In *Jarrell*, however, the prospective juror was asked whether she "leaned" toward a life sentence and had "qualms" about the death penalty, and, when she answered "yes," the trial court disqualified her without hearing anything further. Thus, the prospective juror in *Jarrell* literally was disqualified for expressing no more than a "leaning" toward a life sentence and "qualms" about the death penalty. Under these circumstances, this Court properly reversed, holding that

> [f]urther voir dire examination of this juror might have established a reluctance to impose a death sentence so strong it would "prevent or substantially impair" the performance of her duties as a juror.

*Jarrell v. State*, supra at 881-882 (1). Here, entirely unlike *Jarrell*, however, the trial court did not base its disqualifications upon the prospective jurors' mere expressions of "qualms" and "leanings." Instead, the trial court undertook an extensive and thorough voir dire to determine whether the prospective jurors' views on capital

punishment were such as would prevent or substantially impair the performance of their duties in accordance with their instructions and oath. The trial court's findings in this regard cannot be reversed simply because, at some point during the extensive and thorough voir dire, each of the prospective jurors may have uttered statements which seemingly indicated her qualification. The trial court, in the exercise of its discretion, was not required to accept a prospective juror's isolated expression of an opinion as to her own qualification.

Greene also urges that *Pope v. State*, 256 Ga. 195, 201 (7) (e) (345 SE2d 831) (1986) compels a reversal of the trial court's findings in this case. In *Pope*, however, the trial court found a prospective juror to be qualified, despite his unequivocal and uncontradicted testimony that, if a guilty verdict was returned, he would vote for the death penalty automatically and without regard to the evidence of mitigation. Under these circumstances, this Court properly reversed, holding that "[a] juror who has made up his mind prior to trial that he will not weigh evidence in mitigation is not impartial." *Pope v. State*, supra at 202 (7) (e). This case differs from *Pope*, however, in that, here, none of the prospective jurors offered unequivocal and uncontradicted testimony which demanded a finding of her qualification. Instead, each of the prospective jurors offered equivocal and contradictory testimony which authorized the trial court to find that her view on capital punishment was such as to prevent or substantially impair the performance of her duties. The trial court's findings in this regard cannot be reversed simply because the disqualifications do not appear with "unmistakable clarity." The trial court, in the exercise of its discretion, was not required to accept that portion of a prospective juror's equivocal and contradictory testimony which indicated her qualification.

Considering the entirety of the extensive and thorough voir dire and giving the requisite deference to the trial court's findings, a reversal of the disqualifications of the prospective jurors in this case would be contrary to the controlling authority of *Ledford*, supra, and innumerable other cases previously decided by this Court. Accordingly, we adhere to our original judgment and affirm Greene's convictions and sentences.

*Judgments affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

BENHAM, Chief Justice, dissenting.

The U. S. Supreme Court remanded this case to this Court in order that we might articulate the standard of review we apply to a trial court's findings when a venireperson is dismissed for cause due to juror bias. *Greene v. Georgia*, 519 U. S. ___ (117 SC 578, 136 LE2d 507) (1996). In an attempt to comply with the Supreme Court man-

date, the majority holds that we have always deferred to the findings made by the trial court and that when a prospective juror offers conflicting testimony concerning the juror's ability to vote for imposition of the death penalty, that deference requires this Court to uphold whatever the trial court decided regarding that juror's continued participation in the trial. Such a standard has never been applied by this Court, for it completely negates this Court's ability to reverse a death sentence on this ground, and we have reversed death sentences on this ground in the past. See *Jarrell v. State*, 261 Ga. 880 (413 SE2d 710) (1992). Rather, the sweeping "deference" accorded trial courts by the majority is a complete relinquishment of this Court's duties and responsibilities as an appellate court and as the court of last resort in Georgia. Accordingly, I must respectfully dissent.

In *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), the U. S. Supreme Court held that a death sentence could not be carried out if the jury which imposed it or recommended its imposition was chosen by excluding venirepersons because they voiced general objections or conscientious or religious scruples against the death penalty. The court pointed out that

> the most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out. . . ."

Id., 391 U. S. at 522, n. 21. The standard of utter and complete deference to the trial court's determination enunciated today by the majority permits the exclusion of any venireperson who voiced *concerns* about the imposition of the death penalty *so long as* the venireperson also expressed an ability to consider the death penalty as a punishment. In effect, by stating equivocal positions, i.e., that he/she could consider imposition of the death penalty despite having concerns about the imposition of a death sentence, the trial court's decision as to whether that juror is excused for cause or remains on the panel is the final word on the matter. Should, as here, the trial court dismiss the venirepersons for cause, there is a good chance that the jury which imposed the death penalty was selected by excluding those who voiced religious, conscientious, or general objections to imposition of the death penalty, in direct violation of the holding in *Witherspoon*, supra. We are also faced with the possibility of conflicting

results statewide as each trial judge makes an unregulated, unstandardized decision about "equivocal" venirepersons.

The majority opines that each of the prospective jurors at issue in this appeal "offered equivocal and contradictory testimony which authorized the trial court to find that [the juror's] view on capital punishment was such as to prevent or substantially impair the performance of her duties." Majority opinion, p. 54. The fact that a juror expresses a variety of opinions regarding the death penalty is not an unusual situation. As former Chief Justice Weltner observed on behalf of the court in *Spivey v. State*, 253 Ga. 187, 197, n. 3 (319 SE2d 420) (1984):

> [W]e offer this parenthetical comment upon the general problems involved in Witherspoon questions. First, it should be noted that prospective jurors rarely come into court with precisely defined opinions relative to the death penalty. Instead, most carry with them contradictions arising from a deep-seated human need to avenge outrageous cruelty, a quasi-religious tendency toward forgiveness, and a sense of the worth of every human life. Few have been called upon to formulate and express their thoughts with any degree of clarity or precision. In reality, then, voir dire becomes an exercise in the *shaping* of opinions, more so than their expression. Again and again, the record in death cases will contain answers which are ambiguous, equivocal, and contradictory. That is *not* because the juror is attempting to dissimulate, but because he never before has been required to formulate and express, with solemnity and finality, a viewpoint on one of the most controversial issues in modern American culture. The fact that a juror may arrive at a posture which varies from his initial expressions should be understood as exactly what it is — a final distillation, after substantial questioning by contending counsel and often by the judge, of theretofore unarticulated, amorphous, and casual thoughts upon capital punishment.

Excusal for cause is appropriate when a venireperson states "unambiguously and unequivocally that he or she would vote against the death penalty regardless of what evidence might be presented at trial." Id. at 193. In the case at bar, in direct conflict with *Spivey*, the majority upholds the trial court's excusals for cause of jurors who were ambiguous and equivocal in their voir dire responses. In *Witherspoon*, supra, 391 U. S. at 516, n. 9, the court stated, "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the

trial might reveal, it simple cannot be assumed that that is his position." In the case at bar, the majority endorses by affirmation the trial court's excusal for cause of a juror who "appears to have been unable to articulate her true feelings" about the death penalty because she gave conflicting and equivocal answers (Majority opinion at 50), a juror who gave "conflicting and equivocal" responses and "had some difficulty expressing her true feelings regarding the death sentence (Majority opinion at 51), a juror who "harbored a strongly held religious aversion to the death penalty" (Majority opinion at 52), a juror who "held a strong personal aversion to the death penalty and was uncertain as to whether she could actually vote to impose that sentence" (Majority opinion at 52), and a juror who "could not affirm that she was unbiased against the death penalty. . . ." Majority opinion at 53. None of these venirewomen "state[d] unambiguously that she would automatically vote against the imposition of capital punishment no matter what the trial might reveal. . . ." Id. Rather, the trial court, and now the majority, *assumed* that was each woman's position, in direct conflict with the directive given by the Supreme Court in *Witherspoon*.

Each of the venirewomen stated there were circumstances under which they could impose the death penalty. See *Greene v. State*, 266 Ga. 439, 454-456 (Benham, C. J., dissenting in part). The trial court wrongfully dismissed them for cause, and the majority errs in affirming that action.

I am authorized to state that Presiding Justice Fletcher and Justice Sears join in this dissent.

DECIDED MAY 5, 1997 —
RECONSIDERATION DENIED MAY 30, 1997.

*William L. Kirby II, Charlotta Norby, Stephen B. Bright, Herbert L. Wells,* for appellant.

*J. Gray Conger, District Attorney, Lori L. Canfield, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Susan V. Boleyn, Senior Assistant Attorneys General,* for appellee.